OFFICE OF DISCIPLINARY COUNSEL *v.* JOHNSON.

[Cite as *Disciplinary Counsel v. Johnson,*
100 Ohio St.3d 291, 2003-Ohio-5753.]

(No. 2003–0817—Submitted June 24, 2003—Decided November 12, 2003.)

**Per Curiam.**

{¶ 1} Respondent, Jacqueline Tullos Johnson of New Albany, Ohio, Attorney Registration No. 0029249, was admitted to the Ohio bar in 1982. In a complaint filed on April 8, 2002, relator, Office of Disciplinary Counsel, charged respondent with four counts of professional misconduct. Respondent answered the complaint but did not answer allegations raised in a fifth count added later by amendment. A panel of the Board of Commissioners on Grievances and Discipline heard the matter on January 17, 2003, and made findings of fact, conclusions of law, and a recommendation.[1]

{¶ 2} With respect to Count I, respondent agreed in 1994 to appeal an order denying an incarcerated client's motion to vacate his sentence. Respondent filed the appeal but did not file a brief, and the court dismissed the appeal for want of prosecution. Despite the dismissal, respondent advised her client that she had filed a brief and that the appeal remained pending. The panel found that respondent had thereby violated DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(5) (engaging in conduct prejudicial to the administration of justice), 6–101(A)(3) (neglecting an entrusted

---

1. Respondent requested a continuance, citing incomplete preparation because of ongoing health concerns, on the day before the hearing. The panel chair denied the motion, and respondent moved for reconsideration. The full panel denied reconsideration at the outset of the hearing, observing that the proceeding had been scheduled, with notice to the parties, since September 2001. Respondent participated in the hearing pro se.

legal matter), 7–101(A)(2) (failing to carry out a contract for employment), and 7–101(A)(3) (causing a client damage or prejudice).

{¶ 3} With respect to Count II, in March 1995, while still representing her incarcerated client, respondent prepared a settlement agreement to terminate the client's business relationship with two associates. The agreement provided for the associates' transfer of assets to Keystone Financial Services, Inc. ("Keystone"), a lending company that had previously been inactive, and for respondent to receive all of Keystone's stock in trust for her client.

{¶ 4} Respondent entered into the settlement agreement on her client's behalf pursuant to a power of attorney, promising to hold the Keystone stock in trust for her client and to maintain custody of the corporation's assets. Neither respondent nor her client, who considered himself the sole owner of Keystone, specifically documented their trust arrangement.

{¶ 5} On March 15, 1995, the day respondent and the associates executed the settlement agreement, respondent issued 1,500 shares of Keystone stock to herself. The stock certificates listed respondent as Keystone's president and secretary-treasurer. Also on that day, respondent conducted Keystone's annual meeting and indicated in the minutes that she was the company's only director and the sole shareholder. In deposition testimony submitted for the panel's consideration, however, respondent's client insisted that he had not intended to relinquish his ownership interests to respondent. Moreover, despite the records documenting that respondent assumed ownership of Keystone in March 1995, respondent had previously represented under oath that this did not occur until March 1996. The panel found that respondent had thereby violated DR 1–102(A)(4).

{¶ 6} With respect to Count III, in June 1995, respondent sent on Keystone's behalf a letter of commitment to Thermal Imaging, Inc., an Oregon corporation that was interested in a loan for the development of medical diagnostic technology. In the letter, Keystone offered to lend Thermal Imaging $1.4 million for a term of two years in exchange for a promissory note and the corporation's pledge of 2,000,000 shares in Computerized Thermal Imaging, Inc. ("COII"), a related technology company, as security for repayment of the loan. According to other terms, the number of shares pledged as collateral was to be increased if necessary to maintain a 40 percent loan-to-value ratio. The letter also provided for closing on the loan within five banking days after execution of the promissory note and pledge agreement, delivery of the stock certificates, and transfer of the stock into Keystone's name.

{¶ 7} On July 19, 1995, the president of Thermal Imaging and respondent, on behalf of Keystone, executed a promissory note and a pledge agreement for the loan. The agreement provided for Keystone to receive a security interest in

2,000,000 shares of stock in COII and for Keystone to serve as attorney-in-fact in arranging for the transfer of the pledged shares. The pledge agreement also authorized Keystone, with seven days' notice to Thermal Imaging, to sell the pledged shares upon default of the terms of the loan.

{¶ 8} Thermal Imaging promptly transferred the pledged shares to Keystone and complied with all other conditions necessary for the loan to be funded. Notwithstanding this, Keystone advised Thermal Imaging that the closing would be delayed due to Keystone's difficulty in finding a brokerage firm to accept the COII shares. On August 23 or 24, 1995, Keystone deposited the shares with a securities firm in New York and sent Thermal Imaging a stock loan closing statement containing the terms of the distribution, including that Thermal Imaging would receive net proceeds in the amount of $1,193,611 pursuant to a loan of $1,272,000. Based on the commitment letter, the closing and funding of the loan should have occurred shortly thereafter. Keystone, however, never funded the loan. At the end of August, Thermal Imaging representatives noticed heavy trading in COII stock. By early September, Thermal Imaging suspected that Keystone was converting and selling the pledged shares.

{¶ 9} In fact, Keystone had sold pledged COII shares. To stop these sales, a federal district court granted Thermal Imaging's request for a temporary restraining order, finding that Keystone had wrongfully transferred and sold 685,000 shares of COII stock and was further attempting to transfer and sell an additional 1,315,000 shares. Keystone paid approximately $687,000 representing a portion of the sale proceeds over to Thermal Imaging.

{¶ 10} Respondent could not account for the rest of the sale proceeds; however, she did not accept any responsibility for the sold stock, claiming that other Keystone employees had arranged the sales as part of the company's day-to-day transactions. Respondent also claimed that an officer of Thermal Imaging had authorized the sale of the pledged shares. The president of Thermal Imaging denied this assertion, and the panel credited his testimony. For this and her other acts related to the failed Thermal Imaging loan, the panel found that respondent had violated DR–102(A)(4) and (6) (engaging in conduct that adversely reflects on the attorney's fitness to practice law).

{¶ 11} With respect to Count IV, the panel found that respondent violated Gov.Bar R. V(4)(G) (failing to cooperate in disciplinary proceedings) because she did not respond timely, completely, or at all to several letters of inquiry she received during relator's investigation of her misconduct. Respondent also did not answer the amended complaint, comply with the panel's order compelling discovery, attend her client's deposition despite proper notice, or participate in a prehearing conference call. Moreover, respondent attempted to delay the panel hearing with an unwarranted, last-minute request for a continuance.

{¶ 12} Finally, with respect to Count V, the panel found that respondent violated DR 1–102(A)(6) and 7–104(A)(1) (improperly communicating with a party the attorney knows is represented by counsel) while representing a divorced client in a dispute over grandparent visitation. In May 2001, respondent telephoned the paternal grandmother of her client's daughter to ask for her attorney's home phone number. Respondent made this call even though she knew that the grandmother was represented and that the grandmother's attorney had not given respondent permission to contact his client.

{¶ 13} Moreover, on July 5, 2001, respondent, her small son, and her client went to the paternal grandparents' home and harassed the grandmother, apparently in an attempt to change the granddaughter's visitation arrangements. Respondent repeatedly rang the front doorbell while her client repeatedly pounded on another door. The grandmother was so concerned that she called the police. When officers arrived, the grandmother showed them court records granting her and her husband visitation with the child from July 1 through July 15, 2001. Notwithstanding this, respondent argued with the officers until she was forced to leave the premises under threat of arrest.

{¶ 14} Several days after this episode, respondent and her client passed out fliers to passersby outside a rodeo event being held by the ex-husband's family. Respondent was arrested during the event for impeding traffic, charged with disorderly conduct, and subsequently convicted.

{¶ 15} In recommending a sanction for this misconduct, the panel reviewed the mitigating and aggravating considerations in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline. The panel found respondent's lack of a prior disciplinary record mitigating but also found that respondent had been uncooperative, unwilling to accept responsibility, and unprofessional. The panel accepted the sanction suggested by relator and recommended that respondent be indefinitely suspended from the practice of law. The board adopted the panel's findings of misconduct and recommendation.

{¶ 16} We agree that respondent violated DR 1–102(A)(4), 1–102(A)(5), 6–101(A)(3), 7–101(A)(2), 7–101(A)(3), and 7–104(A)(1), and Gov.Bar R. V(4)(G). We also agree that an indefinite suspension is a commensurate sanction for this misconduct.

{¶ 17} Respondent committed several violations of DR 1–102(A)(4), which, given the dearth of mitigating factors, requires an actual suspension of respondent's license. *Disciplinary Counsel v. Herman,* 99 Ohio St.3d 362, 2003-Ohio-3932, 792 N.E.2d 1078. Moreover, respondent seriously mishandled an incarcerated client's lending company, including having sold collateral put up by a trusting customer. This misconduct, exacerbated by respondent's lack of cooper-

ation and professionalism, manifests respondent's propensity for self-dealing and warrants a sanction.

{¶ 18} For these reasons, we accept the sanction recommended by the board. Respondent is therefore suspended indefinitely from the practice of law in Ohio. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

---

Jonathan E. Coughlan, Disciplinary Counsel, and Stacy Solochek Beckman, Assistant Disciplinary Counsel, for relator.

Jacqueline Tullos Johnson, pro se.